THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE NEW YORK TRUST COMPANY, Appellant, against MARK GRAVES et al., Constituting the State Tax Commission of the State of New York, Respondents.

Third Department, November 11, 1942.

*Chester Rohrlich, Alfred A. Cook, Leo B. Kagan* and *Bernard Soman* for appellant.

*John J. Bennett, Jr., Attorney-General (Leon M. Layden* and *Wendell P. Brown* of counsel), for respondents.

HEFFERNAN, J. This proceeding was instituted by relator to review a final determination of the State Tax Commission affirming an assessment of additional tax of $40,117.02 against it for the year 1929 under article 9-B of the Tax Law.

In its return for that year relator claimed a deduction in the amount of $67,489.44 for extraordinary repairs and a further deduction in the sum of $824,000 alleged to be a "reasonable allowance for salaries or other compensation for personal services actually rendered" arising out of the issuance and sale of stock to officers and employees of the corporation. These deductions were disallowed. No question is raised as to the propriety of the disallowance of the item for extraordinary repairs.

Although respondents are now attempting for the first time to question the reasonableness of the amount of the item for salaries we think no such issue is presented for determination. In the proceedings before the respondents that contention was not made; in fact the record shows that both parties conceded that only a question of law is involved. If respondents were of the opinion that the deduction claimed should be disallowed in whole or in part because unreasonable in amount it was incumbent upon them to say so in order that relator might have submitted proof on that subject. Having failed to do so, good faith and fair dealing now forbid that they should be permitted to introduce an issue entirely extraneous to the question of law presented.

To understand the legal question to be decided it is necessary to review the facts in some detail. For five years prior to 1929 relator, through its board of trustees, annually distributed to its officers and to some of its employees, pursuant to a profit-sharing policy adopted by it, a sum in addition to their salaries in recognition of services rendered by them during the year covered by such distribution. In 1929 the plan for making payments of extra compensation through the medium of cash profit-sharing was placed on a different footing. Under the new plan the extra compensation was to take the form of stock bonuses rather than cash.

On January 16, 1929 a resolution was adopted by the board of trustees of relator extending for a period of five years the profit-sharing policy for officers and employees then in effect The resolution also recommended to relator's stockholders that the authorized capital stock of the company be increased by $2,500,000 and further recommended that the par value of the company's shares be changed from $100 a share to $25 a share. The proposed increase of capital stock would thus be represented by 100,000 newly authorized shares of the par value of $25 each. The resolution also recommended that the stockholders authorize the issuance and sale of a part of the new stock to trustees of a trust to be formed, to be held by them for the benefit of officers and employees of relator as part of the profit-sharing policy.

At a meeting of the stockholders held on February 14, 1929, the recommendations of the board of trustees were adopted. Thereby the stockholders authorized a four for one split of shares so that 100,000 shares of old stock of the par value of $100 became 400,000 shares of the par value of $25. The capital of the company was increased from $10,000,000 to $12,500,000 by the issuance of 100,000 shares of new stock of the par value of $25. Rights to subscribe to 80,000 of the new shares at $75 per share were issued to the stockholders. The remaining 20,000 new shares were to be issued and sold to the trustees of the trust to be created at the same price, to be held for the benefit of officers and employees of relator pursuant to the plan approved by the stockholders. It is stipulated that at this time the fair market value of each share of stock was $273.

On March 26, 1929, the proposed trust was created by a trust agreement between the relator and certain trustees under the terms of which 19,928 shares of stock were issued and sold to such trustees. The remaining 72 shares, for reasons not disclosed in the record, apparently were issued and sold to certain stockholders.

Under the terms of the agreement the trustees were directed to allot the 19,928 shares of stock annually for five years, beginning January 1, 1929, at the rate of 4,000 shares per annum for the first four years and the remaining shares for the fifth year at $75 per share to officers and employees of relator qualified to participate in the profit-sharing plan on the basis of their salaries. Earnings distributable by relator to employees, under other features of its profit-sharing policy, and dividends on allotted stock held by the trust, were to be applied in payment of the stock allotted to such employees. The board of trustees of relator was empowered to designate the officers and employees to whom stock should be allotted each year and the amount thereof but could not direct the trust to relinquish stock for any other purpose. Under no circumstances could a participant obtain possession of the shares allotted to him before the termination of the trust on December 31, 1933.

In its return showing its net income for the calendar year 1929 relator claimed a deduction of $824,000 representing the difference between the fair market value at the time of the sale by relator to the trust on March 26, 1929, of the 4,000 shares allotted by the trustees in that year amounting to $1,124,000 and $300,-000, the actual price of such shares. In view of the terms of the stipulation of the parties fixing the value of the stock the difference is $792,000 and not $824,000.

In its returns based upon net income for the years 1930 to 1933, inclusive, relator claimed like deductions. In this proceeding however we are dealing only with the 1929 deduction.

The question for us to determine is whether or not the difference between the amount received for the shares of stock issued and sold to officers and employees of relator by virtue of its profit-sharing plan and the fair market value of such stock is a proper deduction in determining net income.

The pertinent provisions of section 219-z of article 9-B of the Tax Law relating to deductions are: ''In computing net income there shall be allowed as deductions: 1. All the ordinary and necessary expenses paid or incurred during the year in carrying on business, including a reasonable allowance for salaries or other compensation for personal services actually rendered, * * * ''

The contention of relator is that it incurred an ordinary and necessary expense of its business when, for the purpose of paying extra compensation to its officers and employees, it created a trust of shares of its own stock which could have been sold for $3,945,744, more than the amount it received. It asserts that the

extra compensation so paid differs in no way from the ordinary salary or bonus paid in cash, and that distribution of the shares constitutes taxable income to the officers and employees and that relator is entitled to a corresponding deduction from its own taxable income. Relator's argument is predicated on the erroneous assumption that the transfer of the 19,928 shares to the trustees conferred upon it an absolute right to dispose of this stock. The answer to that argument is that relator had no authority to sell these shares to anyone except the officers and designated employees. The powers of relator with reference to this stock were strictly limited to the specific purpose of providing increased compensation to its officers and employees. The stockholders were requested to sanction and did sanction the issuance of the shares of stock by relator to the trustees as part of a stock bonus plan. The stockholders had a preemptive right to acquire this stock for their own benefit on compliance with the terms upon which it was issued. Except where additional shares are issued in exchange for property or services, to purchase and extinguish debts and claims against a corporation, or for any consideration other than cash, each stockholder has an inherent right to a proportionate share of the new stock. "The new stock belongs to the old stockholders in proportion to their holding of old stock, subject to compliance with the lawful terms upon which it is issued." (*Stokes* v. *Continental Trust Co.*, 186 N. Y. 285; *Dunlay* v. *Avenue M Garage & R. Co.*, 253 N. Y. 274.) This right is subject to all reasonable conditions imposed by the corporation's board of directors. It must be exercised promptly. No stockholder can be compelled to take additional shares; and no stockholder is entitled to any additional shares except upon payment of the full purchase price fixed by the corporation in its offer to him.

In this proceeding the new stock was sold for cash. The stockholders acquired 80,072 shares at $75 per share; the remaining 19,928 shares were sold to trustees for the benefit of relator's officers and employees at precisely the same figure. If the stockholders had exercised their inherent right and purchased the entire issue the relator would have realized the identical amount which it did by virtue of the profit-sharing plan.

The crucial question is, what loss, if any, did relator sustain by reason of this stock transaction? Certainly neither its income nor its assets were injuriously affected. It neither gained nor lost a dollar by the venture. No diminution of its capital assets was sustained and not a dollar of expense was incurred. Having sustained no diminution of assets and no expense, the deduction was properly disallowed.

If the stockholders had purchased the 19,928 shares, the purchase price to be thereafter refunded to them out of sales, and then transferred them to the trustees, on the same terms and for the use of the same beneficiaries as outlined in relator's profit-sharing plan, in that event it could not be contended that relator had sustained a loss. (*National Cash Register Co.* v. *United States,* 10 Fed. Supp. 687; certiorari denied, 297 U. S. 710.)

In principle there is no difference between the hypothetical case and the one under consideration. The contribution to the officers and employees while nominally the act of relator was in reality the act of its stockholders. The relator had no property right in the stock and was merely acting as the agent of the stockholders for the purpose of consummating the profit-sharing scheme, to which it contributed neither stock nor cash.

Relator on the argument and in its very excellent brief has pressed upon us many decisions of the Board of Tax Appeals and the Federal courts to sustain its position. We have given them careful consideration but in our opinion they are inapplicable. In none of the cases cited do the facts parallel those in the case under consideration.

Respondents also urge that under no circumstances could any deduction be made by relator until the termination of the trust. In view of our conclusion it is unnecessary to discuss that question.

The determination of the State Tax Commission should be confirmed with fifty dollars costs and disbursements.

BLISS, J. (dissenting). We have here no dispute of fact. The question is one of law. Was the transfer of part of its own stock by the corporation through the trustees under the profit-sharing agreement to its officers and employees at less than its value reasonable compensation for personal services actually rendered? It is undeniable that the participating employees were enriched to the extent of their beneficial interest in the stock thus transferred (*Old Colony Trust Co.* v. *Comr. of Int. Rev.,* 59 Fed. Rep. [2d] 168; *Olson* v. *Comr. of Int. Rev.,* 67 Fed. Rep. [2d] 726; certiorari denied, 292 U. S. 637; *Gross* v. *Comr. of Int. Rev.,* 92 Fed. Rep. [2d] 621), and that the corporation had parted with an amount equal in value. (*Comr. of Int. Rev.* v. *Texas Pipe Line Co.,* 87 Fed. Rep. [2d] 662; *Gross* v. *Comr. of Int. Rev.,* 92 Fed. Rep. [2d] 621.)

For several years reasonable additional compensation to employees by way of bonuses or profit-sharing have been deductible in computing net income. (*Lucas* v. *Ox Fibre Brush Co.,* 281 U. S. 115.)

It is argued that not the corporation but its stockholders presented the employees with this stock because the value of every other share of stock was diminished proportionately by the transfer. The answer is found in the fact that stockholders had at their special meeting, consented that the corporation carry out the profit-sharing plan and make such transfer and waived their right to subscribe to their proportionate shares of such new stock. Thus the corporation made the transfer direct from its treasury at less than the actual value of new stock. The same argument might be made if the profits had been shared in cash or any other property. Ultimately the stockholders would have to bear the loss and their stock would be proportionately diminished in value. But it could not be denied that the corporation made the payment. So here it was the corporation which parted with its own stock to the trustees.

We may assume that the stockholders expected to receive their return in increased interest in their work on the part of the employees and in the added incentive to continue with the corporation, and that this would compensate them by increasing the value of their stock or the dividends to be declared thereon.

The State argues that the transaction occasioned no expense, loss or diminution of assets to the corporation when the corporation removed this new stock from its treasury and issued it to the trustees. It was then compelled to set up on the liabilities side of its balance sheet an increased amount of stock outstanding. The corporate assets represented by the new stock had passed from the corporation to the trustees. And the transfer was final. Under no circumstances could the corporation recover back the stock thus parted with at less than value. The State also argues that the trust company was acting throughout simply as an agent for the stockholders to carry out the profit-sharing plan. The same is true of every other transaction of a corporation. It is always acting for its stockholders but it is also a separate entity and the transactions are its own.

Had this stock been sold on the market for its full value and any portion of the proceeds turned over to the employees or trustees for their benefit there would be no question but that such amount would be deductible, if reasonable. I see no difference in principle between delivering the stock or the cash. Either is a payment of extra compensation by the corporation to its employees.

Finally, it was stated upon the argument and not denied that the Federal taxing authorities have allowed the deduction here

in question. This is a potent argument for its allowance by the State. (*People ex rel. Mosbacher* v. *Graves*, 254 App. Div. 438; affd., 279 N. Y. 793.)

This issue came to rest in the Federal courts some time ago. It would serve no useful purpose to indulge in copious quotations from Federal opinions or repeat the reasons there adopted. Suffice it to say that their logic is sound and the arguments here presented by respondents were there rejected.

The determination of the State Tax Commission should be annulled and the deduction allowed.

HILL, P. J., and SCHENCK, J., concur with HEFFERNAN, J.; BLISS, J., dissents, in opinion with which FOSTER, J., concurs.

Determination of the State Tax Commission confirmed with fifty dollars costs and disbursements.